UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa Jane Hagan, | ) | Civil Action No.  5:15-2194-DCN-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

In July 2010, Plaintiff filed an application for DIB alleging a disability onset date of December 1, 2007. Tr. 118. Her application was denied initially and upon reconsideration. Tr. 64, 69. Plaintiff requested a hearing and on December 8, 2011, a hearing was held before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. 26-57. At the hearing Plaintiff amended her alleged onset date to June 1, 2010. Tr. 30. On March 19, 2012, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 10-21. After the Appeals Council denied her request for review, Tr. 1-6, Plaintiff appealed the unfavorable decision to the United States District Court for the District of South Carolina and obtained an Order, filed August 15, 2014, reversing the Commissioner's decision and remanding the case for further proceedings, Tr.

579-85. Based on the court's order, on October 7, 2014, the Appeals Council vacated the final decision of the Commissioner and remanded the matter for "further proceedings consistent with the order of the court." Tr. 586-89. ALJ Morriss conducted a second administrative hearing on January 22, 2015. Tr. 529-51. On March 23, 2015, the ALJ issued an unfavorable decision denying Plaintiff's claim. Tr. 510-23. Bypassing the Appeals Council, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on May 29, 2015.[1] ECF No. 1.

B.      Plaintiff's Background

Born in April 1959, Plaintiff was 51 years old as of the June 1, 2010, amended alleged onset date and 55 years old on the date of her second administrative hearing. Tr. 532.  She has a tenth grade education and has not attained her GED. *Id.* Plaintiff has past relevant work ("PRW") in a retail store making and selling blinds, as a retail inventory specialist, as a gas station clerk, a grocery store clerk, and a bingo parlor clerk. Tr. 144. In her initial Disability Report-Adult, Plaintiff indicated she  stopped working because she "was let go and my other conditions." Tr. 143. Plaintiff listed the following conditions that limited her ability to work: chronic asthma with COPD and emphysema, chronic back pain due to a column missing in lower spine, degenerative disk (back), manic depression and bipolar, and swelling in her right knee due to "water buildup around the knee." *Id.*

---

[1]  Pursuant to the regulations, "when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case." 20 C.F.R. § 404.984(a). Here, the Appeals Council did not assume jurisdiction.

C.     The 2015 Administrative Hearing

Plaintiff's second administrative hearing was held on January 22, 2015; Plaintiff appeared with her counsel, Attorney Beatrice Whitten, and testified before ALJ Morriss. Tr. 529-51. The ALJ noted the hearing was convened because his earlier decision was remanded by a district court for additional proceedings. Tr. 531.

Plaintiff was questioned by her counsel who indicated that she wanted to talk about the time period from when Plaintiff first became disabled in 2007 until the date she was last insured for benefits—September 30, 2011. Tr. 532. Counsel asked Plaintiff what was going on with her medically during that period and Plaintiff responded:

> It started out my last job. I was working in a deli, and it started out I was doing the food, the hot food, and I had to get into the display cabinets, you know, to put the food in there, the Piggly Wiggly. And I got pneumonia once. That was before I found out that I had the COPD, so I didn't know, you know. And then my knee started swelling up with water. And I just couldn't do it anymore. And then I kept trying, but I finally got fired because . . . they said I didn't talk to an employee right.

Tr. 533. Plaintiff stated that it was her left knee that was swollen and very painful as she had "torn the meniscus." *Id.* Plaintiff testified that when she had knee surgery the doctors found out she had osteoarthritis on her kneecaps and the top of her spine so the doctor "had to shave some of [her] bone off [her] knee cap when they got in there." Tr. 533-34. Plaintiff testified that after the surgery her knee "doesn't swell up like it was" and she can bend it. Tr. 534. Plaintiff stated she still has problems with both knees because of the arthritis and both swell up. *Id.* Plaintiff clarified that in 2011 it was the left knee that continued to swell. *Id.* Plaintiff stated that during that time period she had asthma and "was getting pneumonia." *Id.* Plaintiff testified that she found out in 2010 that she had COPD. Tr. 535. Plaintiff stated that her COPD symptoms included "[c]oughing, shortness of breath because I already has asthma, and what I have comes

3

with the bronchitis, too." *Id.* Plaintiff testified that at that time she also had lower back pain that was made worse by standing and walking; she had some mental health symptoms, but that she "had them all [her] life, kind of." Tr. 536. Plaintiff testified that during the period from 2007 to 2011 her mental health symptoms got worse, and it continues to get worse the older she gets. Tr. 537. Plaintiff stated that she is "very claustrophobic" and described an incident where she had a panic attack because she was in the backseat of her daughter's car and unable to open the doors from the inside. Tr. 537-38. Plaintiff described "episodes" or "attacks" where she would get hyperventilated due to stress or being upset. Tr. 538. Plaintiff testified that she has "a lot of depression" and stays in her room because she does not "feel comfortable in big places around a lot of people." Tr. 539. Plaintiff stated that her health issues are making her mental issues worse because she "can't do the things that [she] used to do." Tr. 540. Plaintiff stated that her pain has gotten worse since 2011 but that she had "pretty much been living in pain all [her] life from one thing or the other." *Id.*

Plaintiff testified that she was getting mental health treatment from her family doctor, Dr. Campbell, because she is unable to pay other doctors. Tr. 540-41. Plaintiff stated that she tried Berkeley Mental Health but they no longer see patients based on income. Tr. 541. Plaintiff testified that Dr. Campbell tries to send her to doctors that are willing to wait on payments. *Id.* Plaintiff testified that she is trying to do everything she can to improve her health, including stopping smoking and she realizes that "Dr. Campbell can only do so much. She's just one certain kind of doctor. She's not a psychologist. She's not a back doctor." Tr. 542. Plaintiff testified that affording treatment is a problem and if she could have afforded to see a psychiatrist or psychologist she would have done so. Tr. 542-43. Plaintiff stated that during that period of time she would have been unable to do a desk job or a job where she did not have to stand and

walk because if she sits too long she hurts. Tr. 543. Plaintiff stated she also would have trouble focusing, keeping her concentration, and getting her work done. Tr. 544. Plaintiff testified that pain is "always a distraction." *Id.* Plaintiff described the incident that led to her being fired from her work at the deli counter when she confronted a customer that was "cussing and hollering" at another employee. Tr. 545. Plaintiff stated that the customer complained to management and although Plaintiff felt she did nothing wrong she was fired. Tr. 546.

In response to questions from the ALJ, Plaintiff testified that in 1999 and 2000, before she started working as a bingo clerk, she was working in the grocery store at the deli counter cutting meat and serving food. Tr. 546. The ALJ asked Plaintiff about her inability to afford treatment through Berkeley Mental Health, and Plaintiff confirmed that she could not "go and pay a few dollars and get help." Tr. 547. Plaintiff stated she was able to see Dr. Campbell because she was covered under her husband's insurance and pays a $20 co-pay for doctor's visits. Tr. 548. When asked why she could not use the insurance at Berkeley Mental Health Plaintiff stated: "They don't cover it. They don't cover prescriptions. And I have to pay 20 percent of everything, surgeries, all that." Tr. 549. Plaintiff stated that for Dr. Campbell's prescriptions she uses "the $4 list at Wal-Mart." *Id.* Plaintiff stated that at the time she went to Berkeley Mental Health she did not have health insurance. Tr. 550. Plaintiff confirmed that at the time she sought treatment from Berkeley Mental Health she was denied not because of her ability to afford treatment but because they did not think they could help her situation. *Id.*

In follow-up, Plaintiff's counsel asked Plaintiff if her health insurance covered mental health services and Plaintiff stated it did not and agreed that was part of the problem. Tr. 550. Plaintiff confirmed that the health insurance coverage she has is limited. Tr. 551.

II.    Discussion

A.    The ALJ's Decision

In his March 23, 2015, decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2011.
>
> 2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2010 through her date last insured of September 30, 2011 (20 CFR 404.1571 *et seq.*).
>
> 3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease; degenerative joint disease status post left knee arthroscopy; and chronic obstructive pulmonary disease (20 CFR 404.1520(c)).
>
> 4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours in an 8-hour day; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, frequently balance, and never climb ladders ropes and scaffolds. The claimant must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.
>
> 6.    Through the date last insured, the claimant was capable of performing past relevant work as a bingo shift manager. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2010, the alleged onset date, through September 30, 2011, the date last insured (20 CFR. 404.1520(f)).

Tr. 515-22. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on May 29, 2015. ECF No. 1.

      B.      Legal Framework

            1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see*

whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a vocational expert ("VE") demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

---

*Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff asserts that (1) the ALJ's listing analysis was incomplete; (2) the ALJ's RFC analysis is not supported by substantial evidence, nor based on the proper legal framework; and

(3) the ALJ's Step Four analysis is not based on substantial evidence. Pl.'s Br. 1, ECF No. 19. The Commissioner asserts that substantial evidence supports the ALJ's determination that Plaintiff was not disabled under the Act. Def.'s Br. 13, ECF No. 21.

### 1. Listing 1.04

Plaintiff argues the ALJ "failed to consider the question of medical equivalence" and that she "very nearly met Listing 1.04." Pl.'s Br. 11. The Commissioner asserts the ALJ reasonably found that Plaintiff did not meet or medically equal Listing 1.04(A). Def.'s Br. 14.

"For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. at 530. It is not enough that the claimant have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); *see Bowen v. Yuckert*, 482 U.S. at 146 and n.5 (noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period . . . during which all of the criteria in the Listing of Impairments [were] met." *DeLorme v. Sullivan*, 924 F.2d 841, 847 (9th Cir. 1991) (finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

Listing 1.04 provides, in pertinent part:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral

fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04. A claimant's impairment "is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In his decision, the ALJ considered whether Plaintiff's back problems met Listing 1.04 and determined that "the weight of the evidence of record" failed to indicate that Plaintiff met the Listing requirements—including evidence of motor loss. Tr. 516. The ALJ also specifically noted that Plaintiff's "combination of impairments, especially her degenerative disc disease and depression, has not resulted in the equivalence of listing 1.04 or 12.04, as the claimant is able to independently ambulate to carry out her activities of daily living, including driving a car, with only mild mental difficulties associated with being in public." Tr. 517.

Plaintiff asserts that "[e]xamination showed consistently reduced deep tendon reflexes, positive straight leg raise and radiculopathy. The only finding not evidenced was motor loss." Pl.'s Br. 12. Plaintiff contends that she "presented evidence of degenerative joint disease in her knee" but the ALJ "did not consider whether her positive knee findings were of equal medical

severity to the missing motor loss requirement of Listing 1.04A." *Id.* at 13. Plaintiff argues that the "ultimate question of whether [she] equaled a Listing is not before this Court" but the issue is whether the ALJ made the required analysis. *Id.* The Commissioner argues that "Plaintiff incorrectly states that the only Listing 1.04A criteria she failed to meet was motor loss. She also misstates, with no citation to the record, that she had reduced deep tendon reflexes." Def.'s Br. 15. The Commissioner contends that the ALJ specifically considered the combined effect of Plaintiff's impairments and that Plaintiff's argument that the functional impact of her combined impairments show she medically equals a listing fails. *Id.* at 17.

"To meet the requirements of a listing, [a claimant] must have a medically determinable impairment(s) that satisfies *all* of the criteria in the listing." 20 C.F.R. § 404.1525(d) (emphasis added). Listing 1.04A requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." It is Plaintiff's burden to show that her impairments meet or medically equal a Listing. *See Bowen v. Yuckert*, 482 U.S. at 146. Plaintiff has not shown, as she must show for remand, that further evaluation by the ALJ would have resulted in his finding that her combination of impairments met a Listing. Plaintiff generally refers to "examination" that showed she consistently had reduced deep tendon reflexes, positive straight leg raise and radiculopathy, but she does not cite to any such examination. *See* Pl.'s Br. 12. In her recitation of the medical evidence Plaintiff does cite to two instances of positive straight leg test. Pl.'s Br. 6. The first is an August 31, 2011, examination by a nurse practitioner that provides the following:

EXTREMITIES – no edema, no deformities, normal to light touch and pinprick,

> no CVA tenderness, no clubbing, socks removed, no skin breakdown, good pulses, normal gross sensation to light tough, full range of motion, TTP over lumbar spine and SI joints, neg homans, 2+ pedal and post tib pulses, 1 sec cap refill, warm and well perfused, no cyanosis and pain with bil SLR.

Tr. 407-08. However, the nurse practitioner also provided the following information regarding Plaintiff's neurological examination: "normal gait, normal balance, *normal motor*, cranial nerves 2-12 intact, sensation intact, alert, oriented, no focal signs, *motor intact*, neurovascular intact and Romberg negative."

Tr. 408 (emphasis added). The second instance to which Plaintiff refers is an assessment by Dr. Campbell on September 12, 2011, noting "tenderness to palpation in the lumbar spine and SI joints with positive right straight leg raise." Pl.'s Br. 6. That same notation—which was actually made by the nurse practitioner and not Dr. Campbell—also found Plaintiff had "normal motor" and "motor intact." Tr. 404.

Plaintiff argues that the ALJ did not consider her degenerative joint disease in her knee. The undersigned disagrees. The ALJ determined that Plaintiff had the severe impairment of "degenerative joint disease status post left knee arthroscopy" and considered that impairment independently and in combination with Plaintiff's other impairments. Tr. 516-17. The responsibility for deciding medical equivalence rests with the ALJ. 20 C.F.R. § 404.1526(e). The undersigned recommends a finding that the ALJ appropriately considered Plaintiff's knee impairment and performed the appropriate Listings analysis.

2.  RFC

Plaintiff next contends that the "ALJ failed to perform a function-by-function analysis as required by law and warranted by the evidence." Pl.'s Br. 13. Plaintiff argues "the ALJ failed to establish that [she] could stand and walk for six hours per workday on a regular basis" and failed to consider her "ability to sustain any level of functioning on a regular and continuing basis." *Id.*

at 14-15. The Commissioner argues that "the ALJ fully considered Plaintiff's functional limitations, including her ability to stand and walk, when he determined her RFC for a range of light work through her [date last insured]." Def.'s Br. 19. The Commissioner contends that, in addition to Plaintiff's activities of daily living, the "ALJ also considered the objective medical evidence, Plaintiff's longitudinal treatment history, and the credible medical opinions" to support his decision that "Plaintiff could perform work on a continuing and regular basis within the limits of her RFC assessment." Def.'s Br. 21-22.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*. *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ determines a claimant's RFC by considering how the claimant's impairments may cause physical and mental limitations that affect the person's ability to work. 20 C.F.R. § 404.1545(a). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4).

Here, the ALJ made the following RFC assessment regarding Plaintiff:

[T]hrough the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours in an 8-hour day; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, frequently balance, and never climb ladders ropes and scaffolds. The claimant must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

Tr. 517-18. The ALJ stated that in making this finding he considered Plaintiff's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence . . . ." Tr. 518. The ALJ stated that he also considered opinion evidence. *Id.*

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulation include: physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(b)-(d). In *Mascio v. Colvin*, the Fourth Circuit addressed whether an ALJ's failure to perform a function-by-function assessment necessitates remand. *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015). The court held that "a per se rule [requiring remand] is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* at 636. However, the court "agree[d] with the Second Circuit that '[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.*

Here, at Steps Two and Three of the sequential evaluation process, the ALJ identified Plaintiff's impairments, considered her symptoms, and discussed her physical and mental abilities. Tr. 515-17. In his RFC analysis discussing Plaintiff's symptoms, the ALJ considered Plaintiff's testimony both from the original hearing in 2011 and the subsequent hearing in 2015.[3]

---

[3] The undersigned acknowledges that the focus of the hearing testimony and the ALJ's discussion centers on Plaintiff's mental health. This is to be expected as the district court ordered remand for "a more detailed assessment of [Plaintiff's] mental impairments to determine what, if

Tr. 518-19. In his RFC analysis the ALJ discussed Plaintiff's treatment history and the medical opinions. Tr. 519-22. The ALJ noted the October 3, 2011 opinion of Dr. Campbell limiting Plaintiff to sitting, standing, and walking for "no more than an hour in an eight hour day, with the need to get up and move around every 15-30 minutes." Tr. 521. The ALJ found that "Dr. Campbell's treatment notes do not support the extreme limitations placed on the claimant in her October 3, 2011 statement. Treatment notes document that Dr. Campbell had not examined the claimant since December 8, 2010." *Id.* Despite this finding, the ALJ indicated he considered Dr. Campbell's limitations in light of the objective medical evidence in the nurse practitioner's treatment notes. *Id.* The ALJ noted that the nurse practitioner's treatment note from October 3, 2011, "repeatedly encouraged the claimant to diet and exercise, and did not advise the claimant against any particular exertional activities in the course of her regular treatment of the claimant." *Id.* The ALJ also noted that Plaintiff's two treating orthopedists did not find Plaintiff as limited as Dr. Campbell and "the objective findings in the medical evidence do not support Dr. Campbell's opinion concerning the claimant's expected absenteeism, her need for breaks, or her less than sedentary limitations." *Id.* The ALJ stated that he "considered the combination of the claimant's depression, anxiety, back pain, knee pain, and chronic pulmonary disease in the above stated [RFC], and any additional limitations caused by the combination of these impairments have been taken into consideration with the exertional, postural, and environmental limitations above." *Id.* The ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the weight of the evidence of record. The residual functional capacity assessment accounts for the limitations related to the claimant's chronic back and knee pain and her chronic obstructive pulmonary disease. However, due to the medical evidence as a whole and the claimant's extensive activities of daily living, including driving a car, shopping, cooking, and performing some household

any, limitations they placed on her ability to work . . . ." Tr. 585.

chores, I cannot find that the claimant is incapable of all work activity.

Tr. 522. The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *Bennett v. Astrue*, No. 1:10-CV-1931-RMG, 2011 WL 2470070, at *3 (finding the ALJ's RFC assessment consistent with the regulations and "that the ALJ's opinion sufficiently explained how he determined Plaintiff's RFC as well as his rejection of [the treating physician's] opinion."). Therefore, the undersigned recommends a finding that the ALJ did not fail to assess Plaintiff's capacity to perform relevant functions to such an extent that it would require remand.

### 3. Plaintiff's Ability to Return to PRW

Plaintiff contends that the ALJ's Step Four analysis is not based on substantial evidence because the ALJ did not identify the exertional level of her prior work as a bingo parlor manager and seemed to base his assessment on Plaintiff's description of the work. Pl.'s Br. 16-17. Plaintiff also notes the ALJ "did not proceed to step five to identify other work." *Id.* at 18. The Commissioner asserts "the ALJ reasonably determined that Plaintiff could perform her past relevant work as bingo shift manager as she previously performed it based on the analysis of vocational consultant and Plaintiff's description of her past relevant work." Def.'s Br. 22. The Commissioner also contends that "vocational testimony is *not* required to determine if a claimant can perform her past relevant work at step four of the sequential evaluation process." *Id.* (emphasis in Def.'s Br.).

SSR 82–62 sets out the procedures to be used at Step Four of the sequential evaluation process when determining whether the claimant's RFC permits her to return to her PRW. The ALJ must consider whether a claimant has the RFC to "meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the

17

same kind of work as it is customarily performed throughout the economy),” and, if the claimant can return to her PRW, she may be found to be not disabled. SSR 82–62, 1982 WL 31386, at *3. The ruling further provides:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.*

The ALJ determined that through the date last insured Plaintiff was capable of performing her PRW as a bingo shift manager. Tr. 522. The ALJ noted that this work “did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).” *Id.* The ALJ also stated that in comparing Plaintiff's RFC with the physical and mental demands of her work as a bingo shift manager, he found Plaintiff “is able to perform it as she actually performed it. (Exhibit 9E).”[4]

A claimant bears the burden of demonstrating that her impairment prevents her from performing her PRW. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). If a claimant can perform PRW either as she performed it or as it is generally performed in the economy, the claimant is not disabled within the meaning of the Act. SSR 82–61, 1982 WL 31387, at *2 (1982). An ALJ may also rely on a “properly completed” work history report to furnish

---

[4] Exhibit 9E is a vocational analysis completed by an agency examiner on April 13, 2011, indicating that Plaintiff is restricted to light work with no mental limitations and that Plaintiff retained the capacity for her PRW as a bingo shift manager as she performed it. Tr. 177.

information about a claimant's past work. *Id.* In this case Plaintiff completed a work history report about her job as "shift manager for a bingo hall." Tr. 154. Plaintiff indicated she "Gave out the bingo sheets to be sold. Sold bingo pacts." *Id.* Plaintiff noted that in this job she did not use machines, tools, or equipment and she did not use technical knowledge or skills. *Id.* Plaintiff indicated that each day she walked for 15 minutes, stood for 15 minutes, and sat for 8 hours. *Id.* Plaintiff noted that she "lifted boxes of bingo sheets and carried them about 4 feet to be put in the shelves every shift [she] worked." *Id.* Plaintiff indicated the heaviest weight lifted was less than 10 pounds and she frequently lifted less than 10 pounds. *Id.*

The ALJ considered Plaintiff's impairments, assessed the credibility of Plaintiff's subjective symptoms, evaluated the objective and opinion medical evidence, and found that Plaintiff retained an RFC for "light work as defined in 20 CFR 404.1567(b)." Tr. 517. The ALJ applied the correct legal framework and complied with SSR 82–62 because he made a finding of fact as to Plaintiff's RFC, determined the demands of Plaintiff's past work as a bingo parlor shift manager based on the report of a state agency vocational examiner, and determined that Plaintiff's RFC would permit her to return to her PRW. Tr. 517-22.

The undersigned has reviewed the evidence in the record and the ALJ's discussion and application of it to Plaintiff's claims and finds that there is substantial evidence in the record to support a finding that Plaintiff did not sustain her burden of showing that she cannot perform her PRW. The undersigned recommends a finding that the ALJ's determination at Step Four that Plaintiff can perform her PRW as a bingo parlor shift manager is supported by substantial evidence. Because the ALJ found Plaintiff capable of performing her PRW at Step Four, that ends the sequential evaluation process and precludes the requirement of Step Five analysis. 20 C.F.R. § 404.1520(a). Consequently, the disability determination ended and the ALJ was not

required to proceed to Step Five and seek information from a VE regarding other available work in the national economy that Plaintiff could perform.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned finds that the Commissioner performed an adequate review of the whole record evidence and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under the Act, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

January 24, 2017                                        Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**